IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| James F. Russell,<br><br>    Plaintiff,<br><br>vs.<br><br>Jo Anne B. Barnhart,<br>Commissioner of Social Security,<br><br>    Defendant. | Civil Action No. 6:05-0828-TLW-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

On June 15, 2000, the plaintiff filed an application for DIB alleging disability beginning December 31, 1996. The application was denied initially and on reconsideration, and the plaintiff requested a hearing. Following the hearing on February 25, 2002. at which the plaintiff, his attorney and a vocational expert appeared, the administrative law judge considered the case *de novo*, and on March 17, 2003, determined that the plaintiff was not

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on May 14, 2003.

The plaintiff subsequently filed an action for judicial review (C.A. 6:03-2263-25AK). On July 1, 2004, the Honorable Terry L. Wooten, United States District Judge, reversed the Commissioner's decision and remanded the case for further proceedings. Additional medical evidence was submitted and a supplemental hearing was held on October 26, 2004, at which the plaintiff and his attorney appeared. On November 23, 2004, the ALJ determined that the plaintiff was not entitled to benefits, as he had the residual functional capacity to perform medium work and could perform his past work as a production foreman as of December 31, 2001, the date he was last insured for purposes of eligibility for disability insurance benefits. The ALJ's decision became the Commissioner's final decision for the purposes of judicial review.[2]

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1)     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the pertinent period ending December 31, 2001, but not thereafter.
>
> (2)     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)     The claimant's history of polio, history of stomach cancer necessitating a gastrectomy, diminished lung capacity, and history of transient ischemic attack, are considered "severe" based on the requirements in the Regulations (20 CFR § 404.1420(c).

---

[2]The "Notice of Decision" sent to the plaintiff by the Agency upon the second unfavorable decision by the ALJ included a provision that if he did not file exceptions with the Appeals Council and the Appeals Council did not act of its own accord, the decision of the ALJ would become final 61 days after the date of the notice, and that the plaintiff would then have 60 days in which to file a new civil action before the court. Accordingly, since the plaintiff did not file exceptions with the Appeals Council and the appropriate time period elapsed, the ALJ's decision became the final decision of the Commissioner for purposes of judicial review.

  (4) These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

  (5) The undersigned finds the claimant's allegations of pain, weakness and other subjective symptoms, to the extent that he was precluded from performing a full range of medium work for a continuous 12-month period commencing on or before December 31, 2001, are not credible for the reasons set forth in the body of the decision.

  (6) Despite his combined impairments, including pain, during the pertinent period, the claimant retained the residual functional capacity to perform a full range of medium work requiring frequent lifting of up to 25 pounds and maximum lifting of up to 50 pounds.

  (7) The claimant's past relevant work as a production foreman at a chemical plant, which was a medium job as he described it and a light job as generally performed, did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565).

  (8) The claimant's combined impairments during the pertinent period, including his history of polio, history of stomach cancer necessitating a gastrectomy in 1991, diminished lung capacity, and history of transient ischemic attack, did not prevent him from performing his past relevant work for any period which had lasted or could reasonably have been expected to last for 12 continuous months commencing on or before December 31, 2001.

  (9) The claimant was not under a "disability" as defined in the Social Security Act, at any time on or before December 31, 2001, the date he last met the earnings requirements (20 CFR § 404.1520(e)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and

who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the

national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was born July 12, 1944 (Tr. 97) and was 52 years old at the time of his alleged onset date of disability and 57 years old as of December 31, 2001, the date he was last insured for purposes of eligibility for disability insurance benefits. The plaintiff

5

has a high school equivalent (GED) education (Tr. 115). He worked in the past as a chemical plant operator/foreman, and was self-employed as a wood craftsman (Tr. 110).

The plaintiff had a remote history of polio at age 18 months, leg fractures sustained in a 1965 motor vehicle accident, osteoarthritis, and stomach cancer for which he underwent a subtotal gastric resection in 1991 (Tr. 45, 154, 173, 187). He also has a history of smoking two packs of cigarettes a day for over 30 years (Tr. 165, 171).

The plaintiff presented to Dr. M. Stewart Funderburk, a gastroenterologist, for annual EGD tests in January 1997, February 1998, February 1999, and February 2000. At each appointment, Dr. Funderburk noted the plaintiff's stomach condition was "asymptomatic." The plaintiff denied indigestion, bowel changes, or vomiting blood. Results of the EGD tests consistently fell within normal limits. In February 2000, Dr. Funderburk noted, "Plaintiff has done quite well. This will be eight years postop and he is asymptomatic" (Tr. 157-68, 182-85).

On February 16, 1998, the plaintiff presented to nurse practitioner Wanda O. Copeland with complaints of abdominal pain and a hacking cough. He denied having any difficulty breathing. Ms. Copeland examined the plaintiff and found he had an esophageal spasm and acute bronchitis. She encouraged him to stop smoking (Tr. 172).

On April 8, 1998, the plaintiff presented to nurse practitioner Sally Stroud with complaints of low back pain. Upon examination, the plaintiff demonstrated slight lumbar tenderness and full range of motion. There was no evidence of muscle spasm or tightness over the paraspinal area. The plaintiff had good strength, normal gait, and normal reflexes (Tr. 171).

The plaintiff returned to Ms. Copeland on June 8, 1999, for a check-up. He reported a short bout of dark stools, which resolved with medication. Ms. Copeland noted the plaintiff's low back pain was also controlled on medication. She reported the plaintiff had chronic obstructive pulmonary disease (COPD). Chest x-rays showed mild

6

hyperinflation, no acute findings, and no change since June of 1995. Ms. Copeland assessed arthritis, lower back pain, diverticulitis, gastritis, and COPD. She stated that medication or treatment changes were unnecessary (Tr. 170, 180).

On August 10, 2000, the plaintiff presented to the Veteran's Administration Medical Center (VAMC) for a CT scan of his chest. The scan revealed mild emphysematous change with apical scarring (Tr. 236).

On September 7, 2000, the plaintiff presented to Dr. F. Marian Dwight for a consultative examination. He complained of weakness in his legs, diarrhea, shortness of breath, dumping syndrome[3] and hip pain. He also reported that he had been "self employed since 1991, that he and his wife owned a flower shop, and that his wife did most of the work. Dr. Dwight noted the plaintiff had emphysema and that he had no significant complaints of pain. Physical examination revealed the plaintiff had a normal gait and was able to get onto the examining table without difficulty. He had some tenderness and muscle spasm on the right thigh when lifting his leg, as well as dependent cyanosis in both legs, but his range of motion and reflexes were normal. Straight leg raise tests did not produce pain, and there was no evidence of muscle wasting. X-rays of the plaintiff's lumbar spine showed only mild disc space narrowing at T12-L1, which the radiologist assessed as normal degenerative changes. Chest x-rays shows the plaintiff's lungs were clear except for mild chronic changes. Dr. Dwight assessed emphysema, questionable early peripheral vascular disease secondary to smoking, and possible post-polio syndrome (Tr. 187-90).

VAMC radiology reports dated October 7, 2000, through June 27, 2001, indicate the plaintiff had no significant degenerative change in the right ankle or knee (Tr.

---

[3] Dumping syndrome is "marked by sweating and weakness after eating . . . [and is] caused by the stomach emptying rapidly into the small intestine." *See Taber's Cyclopedic Medical Dictionary* (*Taber's*), 583 (18th ed. 1997).

7

235), a normal lumbar spine (Tr. 230), and only mild to moderate degenerative changes in the left shoulder (Tr. 228).

On August 10, 2000, the plaintiff returned to the VAMC for a follow-up appointment. The plaintiff denied shortness of breath, abdominal discomfort, sweating, and weakness. The attending nurse indicated the plaintiff did not use an inhaler (Tr. 218-20).

On October 18, 2000, Dr. E. Johnson, Jr., a State agency physician, reviewed the plaintiff's records and assessed his physical residual functional capacity. Dr. Johnson determined the plaintiff could perform the exertional requirements of medium work, without other limitations (Tr. 243-50).

The plaintiff returned to the VAMC on November 12, 2000. He reported he had enrolled in a smoking cessation clinic. The attending physician noted the plaintiff had mildly elevated triglycerides. They discussed dietary and lifestyle measures (Tr. 216).

On November 20, 2000, the plaintiff presented to the VAMC with lower back pain which began after he lifted a heavy trailer frame. He reported pain radiating into his hips. Nurse practitioner June Jones provided Flexeril for his spasms and Tylenol for pain (Tr. 209, 212).

On April 2, 2001, the plaintiff returned to the VAMC with complaints of leg weakness. He described falling spells and fatigue. He further stated he had "restless legs" that moved involuntarily. Dr. A. Daniel Vallini examined the plaintiff and noted he walked with a limp. His muscle stretch reflexes were normal, and there was no evidence of sensory deficit, decreased strength, or muscle wasting. Dr. Vallini scheduled nerve studies, but noted he did not see any clinical sign of post-polio syndrome (Tr. 207-09).

On June 8, 2001, the plaintiff presented to the VAMC with complaints of dyspepsia. He stated he also had experienced some symptoms of transient ischemic

8

attack (TIA)[4] during the previous year. The plaintiff denied abdominal discomfort, change in weight or bowel patterns, sweating, and weakness. The attending physician characterized his dyspepsia as stable on medication, and noted the plaintiff did not have an ongoing pain problem (Tr. 202-05).

A VAMC note also indicated that on June 8, 2001, a kinesio therapist gave the plaintiff a cane for his "unstable gait" upon a referral from a VA physician (Tr. 475-79).

The plaintiff returned to Dr. Vallini on July 17, 2001, and reported that his restless leg had improved "remarkably" with medication. He reported an earlier period of time lasting 8-10 weeks in which he was unable to speak clearly or understand, and felt weak, confused, disoriented, and forgetful. He stated he smoked two packs of cigarettes a day (Tr. 680). An MRI scan of the plaintiff's brain revealed mild diffuse cortical atrophy with residuals of a few small ischemic changes (Tr. 283). Carotid artery studies were normal (Tr. 267).

On July 31, 2001, State Agency physician Dr. Robert D. Kukla reviewed the plaintiff's records and determined he did not have any severe impairments (Tr. 241).

A pulmonary function test conducted on August 27, 2001, revealed an "early small airway dysfunction as [may] be seen in asymptomatic smokers" (Tr. 470).

On October 1, 2001, the plaintiff returned to Dr. Vallini for a follow-up visit regarding his restless legs and poor balance. Dr. Vallini found the plaintiff had a good ankle jerk reflex and no sensory deficits. He stated the plaintiff's restless legs were controlled with medication. He directed the plaintiff to return in six months (Tr. 274).

On December 6, 2001, the plaintiff presented to the VA for a follow-up visit. He reported his dumping syndrome had begun in 1991. A series of x-rays revealed "very

---

[4]A TIA is a "temporary interference with blood supply to the brain . . . . After the attack, no evidence of residual brain damage or neurological damage remains. It is not necessarily true that individuals who have experienced TIAs will within the predictable future develop a full vascular occlusion and have a stroke." *See Taber's*, 1984 (18th ed. 1997).

9

mild" degenerative joint disease at each hip. The plaintiff also had mild degenerative changes throughout the cervical spine and in the fingers of the right hand. It was noted that he did not have a pain problem (Tr. 259-67).

At another follow-up visit on December 11, 2001, the plaintiff reported he maintained a stable weight and had occasional dumping syndrome. He also reported esophageal spasms. Clinical notes indicated the plaintiff had "hypoglycemia, reactive by his own account." A subsequent EGD did not reveal any ulcers or masses (Tr. 254-58).

Evidence dated after the plaintiff's date last insured, December 31, 2001, showed worsening right leg weakness, and in April 2002, the plaintiff reported that he was using a cane some of the time (Tr. 296). He had mild leg weakness and minimal atrophy, and was given a knee brace (Tr. 289-99). By July 2002, the plaintiff stated that he was doing "quite well" with the knee brace, and he had full range of motion (Tr. 320). In August 2002, he underwent a consultative examination by Dr. Nasir Waheed and told Dr. Waheed that he was still working (Tr. 311). He also reported using a cane for the last year and a half (Tr. 311). Dr. Waheed noted that the plaintiff walked with a "slight" limp (Tr. 312).

In a "Report of Contact" form completed by an Agency employee on June 25, 2001, it was noted that the plaintiff said he had a "stroke" around July of 2000, and that he did not receive any hospitalization or treatment for it and did not realize it had occurred at the time. He reported telling his physicians about his symptoms in early June 2001, and said his memory loss improved very rapidly. He reported having no further problems with driving, speaking, or communicating (Tr. 142).

At his hearing on February 25, 2002, the plaintiff testified he experienced periodic stomach ulcers, restless legs, chest spasms, depression, and musculoskeletal pain (Tr. 42-43, 47-50). He said he became weak and "a little bit foggy in the head" due to hypoglycemia, dumping syndrome, TIAs, and medication side effects (Tr. 45-46, 53). He further testified he had to eat frequently but often became sick after meals (Tr. 46-47). The

plaintiff said he usually carried a cane, but did not always need it. He said he often needs the cane to steady himself when standing up and when he is tired or nervous (Tr. 48). He said he did not know he had experienced a TIA until eight months after it occurred (Tr. 53). He further testified that his only treatment for hypoglycemia was a strict diet (Tr. 54). The plaintiff said he saw a neurologist approximately every four to six months (Tr. 63). He said he could walk one city block at a time and stand for 30 minutes at a time (Tr. 64-65). The plaintiff testified that on an average day he would get up between 6:30 a.m. and 7:00 a.m., and he would rest after breakfast until about 9:00 a.m., due to his hypoglycemia. After that, he would go to his wood craft shop and "piddle" for a few hours. He will usually lie down at the shop for a nap around 1:00, or he will hurry home (Tr. 55-56).

At the second hearing, held on October 26, 2004, the plaintiff essentially reiterated the same complaints (Tr. 343-68).

## **ANALYSIS**

The plaintiff alleges disability commencing December 31, 1996, due to post-polio syndrome, post cancer problems, chest spasms, sciatica, leg weakness, exhaustion, labored breathing during exertion, and weakness after eating ("dumping syndrome") (Tr. 109). The plaintiff was last insured for purposes of eligibility for disability insurance benefits as of December 31, 2001 (Tr. 323). The plaintiff alleges that the ALJ erred by (1) failing to consider all of his impairments and conduct a sufficient evaluation of his functional capacity; and (2) failing to correctly assess his credibility.

In his order dated June 30, 2004, Judge Wooten remanded this case pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action. Judge Wooten directed the ALJ on remand to consider the plaintiff's impairments as severe at step two of the sequential evaluation process and to continue with the evaluation of the plaintiff's impairments through the remaining steps of the sequential analysis to determine

whether the plaintiff was disabled during his period of eligibility. Judge Wooten specifically mentioned the plaintiff's right leg weakness and noted that in an office note dated August 12, 2002, Dr. Waheed reported that the plaintiff had been using a cane for a year and a half. He also noted that a medical note dated May 6, 2002, from the VA stated that the plaintiff ambulated "independently with standard cane" and the plaintiff had been instructed "to use cane in all environments at this time" (Tr. 372-76).

Upon remand, a hearing was held on October 26, 2004. The ALJ issued a decision on November 23, 2004, denying the application for benefits. In that decision, the ALJ found that the plaintiff's statement that he had been using a cane for approximately a year and a half was "not borne out by the VA records from 2001" (Tr. 320). The plaintiff's use of a cane to ambulate was not factored into the plaintiff's functional capacity assessment (Tr. 322-23). The ALJ found that the plaintiff could perform a full range of medium work and could perform his past relevant work as a production foreman at a chemical plant (Tr. 323). As described by the ALJ, medium work "requires a good deal of walking and standing, frequent bending and stooping, frequent lifting up to 25 pounds, and occasional lifting of up to 50 pounds" (Tr. 322).

The plaintiff argues that he is disabled under the grids if restricted to light work or less, or at a minimum the issue of disability is not resolved if the plaintiff were found to require the use of a cane to ambulate (pl. brief 14-16). The plaintiff further argues that the medical evidence shows that he required the use of a cane after June 2001, well within the insured period, and the ALJ's failure to include this as a restriction in the plaintiff's residual functional capacity was in error (pl. brief 14-19). This court agrees. The plaintiff was referred for a consultation for an assistive device for ambulation on June 8, 2001, due to his difficulty with balance (Tr. 682-83). In October 2001, it was noted that the plaintiff was having increasing problems with poor balance, and an MRI of the brain showed ischemic changes in the deep white matter over the centrum semiovale (Tr. 274). The plaintiff was

also seen a few weeks later for a knee laceration due to a fall (Tr. 668). In May 2002, a few months after the expiration of the insured period, the plaintiff was instructed "to use cane in all environments at this time. He cannot afford to fall again and sustain injuries." The medical records note that the plaintiff had fallen several times due to his knee giving way, and the plaintiff continued to use his standard cane during most ambulation activities. It was further noted that the plaintiff broke several toes in his last fall. The plaintiff was given a knee brace and sent for rehabilitation (Tr. 289-97).

As set forth above, Judge Wooten cited the evidence that the plaintiff requires the use of a cane as a reason that the ALJ's finding that the plaintiff did not suffer from severe impairments was not supported by substantial evidence (Tr. 374). Upon remand, the ALJ provided no additional rationale to support a finding that the plaintiff could ambulate without an assistive device and for not including this restriction in the plaintiff's residual functional capacity (Tr. 316-23). As the plaintiff's need to use a cane would clearly impact the ALJ's findings regarding his ability to perform a full range of medium work activity, the case should be remanded, once again, to the ALJ for proper consideration. The ALJ should also be required to revisit the issue of whether the plaintiff could perform his past work, either as it is generally performed or how he performed it, given his need of a cane to ambulate.

The plaintiff also argues that the ALJ failed to correctly assess his credibility. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding

on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

>  (1) The individual's daily activities;
>
>  (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
>  (3) factors that precipitate and aggravate the symptoms;
>
>  (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
>  (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
>  (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
>  (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found as follows with regard to the plaintiff's credibility:

> Nor is the claimant's description of routine activities during the pertinent period consistent with significant disability at that time. As previously noted, there are repeated references in the medical records of his having continued to engage in at least part-time employment, although there is no evidence that he has performed substantial gainful activity. At the prior hearing in February 2002, which was within two months of the pertinent period, the claimant indicated that his routine activities including helping to care for his ten-year-old grandchild and driving 17 miles to his shop where he stayed for three to four hours a day, occasionally planting trees in one-gallon pots.

> Other medical evidence indicates that the claimant, at least occasionally, engaged in activities requiring strenuous exertion. On November 20, 2000, he was treated for an episode of back pain after "lifting heavy trailor frame on Thrus and Fri (sic)" and on another occasion on January 14, 2002, two weeks after the pertinent period, he complained of pain in his left foot after dropping a "large metal plate about 100 lbs across both feet."

(Tr. 321-22).

The plaintiff first argues that the ALJ's reliance upon his participation in a business with his wife is misplaced as there is no evidence that he engaged in activities contradictory to what he described at his hearings (pl. brief 20). As noted by the plaintiff, he indicated in one consultative evaluation in September 2000 that he and his wife had a "flower place," but that she did most of the work (Tr. 188). It was at a consultative examination in August 2002 that the doctor noted in his report that the plaintiff "is still working" (Tr. 311). At the hearing, the plaintiff testified that he would often go to his wood craft shop and "piddle" for a few hours and he would usually lie down at the shop for a nap around 1:00, or he would hurry home. The plaintiff further testified that he did not "produce anything" at the shop (Tr. 55-56). As argued by the plaintiff, without further clarification or description, it is impossible to know to what extent the evidence may indicate the plaintiff was engaged in activity not compatible with other statements made to the Commissioner. This court agrees. It does not appear from the evidence cited that the ALJ had sufficient evidence to conclude the plaintiff "continued to engage in at least part-time employment."

The ALJ also noted that the plaintiff "helped care for his 10-year-old grandchild" as evidence in support of his credibility finding. However, other than confirming that the grandson often stayed with him and his wife, the plaintiff did not indicate any significant activity relating to caring for his grandson (Tr. 59-60). In addition, the ALJ cited two incidents where the plaintiff was injured apparently attempting to perform exertional activity (Tr. 322). As argued by the plaintiff, without further questioning or clarification of

these incidents at the hearing, it is difficult to say whether this evidence really reveals that the plaintiff was engaging in a greater level of activity than he admitted, thus reducing his credibility. "The ability to work for only a few hours a day on an intermittent basis is not the ability to engage in 'substantial gainful activity.'" *Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978). A claimant need not be bedridden or completely helpless to be found disabled. *Totten v. Califano*, 624 F.2d 10, 11 (4th Cir. 1980). Accordingly, upon remand, the ALJ should be instructed to ascertain information on these issues at a supplemental hearing and to properly evaluate the plaintiff's credibility as discussed above.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

May 23, 2006

Greenville, South Carolina